UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.

LUIS SALAMAN,
*Defendant.*

No. 3:20-cr-192 (JAM)

**ORDER DENYING MOTION TO SUPPRESS**

On the morning of October 2, 2020, federal law enforcement agents executed an arrest warrant at the home of the defendant Luis Salaman. They placed Salaman under arrest on the first floor of the house, and then they conducted what is known as a "protective sweep" of other areas of the house including Salaman's bedroom on the second floor. In his bedroom the agents found and seized Salaman's iPhone from where it lay on his bed.

Salaman now faces federal firearms and narcotics trafficking charges. He has filed a pre-trial motion to suppress the use of the iPhone as evidence against him at trial. He primarily argues that the protective sweep of his bedroom was unlawful under the Fourth Amendment.

I do not agree. Although the testimony at the suppression hearing raises troubling concerns about whether the law enforcement agents fully understand and respect the constitutional limits on their authority, I conclude that Salaman's bedroom was within the lawful scope of a protective sweep and that the agents had lawful authority to seize his iPhone when they saw it in plain view during the protective sweep of his bedroom.

**BACKGROUND**

I make the following findings of fact based on the suppression hearing and related documents.[1] Salaman came under investigation in the summer of 2020 by the federal Bureau of

---

[1] The Government presented testimony from three witnesses at the suppression hearing: (1) Scott Riordan, Resident Agent in Charge of the New Haven Office of the Bureau of Alcohol, Tobacco, Firearms and Explosives; (2) Derek

1

Alcohol, Tobacco, Firearms and Explosives ("ATF") in connection with several shootings and a homicide in New Haven.[2]

On September 30, 2020, a federal magistrate judge issued a criminal complaint and arrest warrant for Salaman.[3] The complaint and arrest warrant were based on an affidavit submitted by an ATF agent establishing probable cause to believe that Salaman had violated federal firearms and narcotics laws.[4] The affidavit recounted how local police had arrested Salaman on a pending warrant eight days before—on September 22, 2020—and found him in possession of distribution quantities of marijuana as well as a loaded .45-caliber handgun with an obliterated serial number.[5] Following this arrest by local police, Salaman was released on bond and living with his mother and step-father at their single-family home in a quiet neighborhood in East Haven, Connecticut.[6]

The ATF decided to execute the federal arrest warrant for Salaman at his home on the morning of October 2, 2020. About a dozen officers met before going to Salaman's house in order to discuss their arrest plan.[7] They were told by the ATF agent in charge—Special Agent Scott Riordan—to be on the lookout for Salaman's iPhone.[8] Agent Riordan knew from police body-cam footage that had been taken by the local police during the arrest of Salaman on

---

Huelsman, a police officer with the City of New Haven and Task Force Officer of the ATF; and (3) Frank Grillo, a police officer with the City of New Haven and Task Force Officer of the Federal Bureau of Investigation. Salaman submitted an affidavit in support of his motion to suppress but did not testify or present any witness testimony. Both sides introduced exhibits.
[2] Doc. #91 at 9.
[3] Doc. #56-1 at 3, 9.
[4] Doc. #56-1 at 4-8.
[5] *Id.* at 6-8; *see also* Doc. #91 at 12. On the day after obtaining the complaint and arrest warrant, the ATF learned that the ammunition recovered from Salaman's handgun matched a spent shell casing located at the scene of a double shooting in New Haven in July 2020. *Id.* at 25.
[6] Doc. #91 at 24, 30, 49, 54, 59, 105; *see also* Doc. #56-2 (ATF Operational Plan which was introduced as Government Exhibit #2 at the suppression hearing).
[7] *Id.* at 28.
[8] *Id.* at 31, 104, 129, 140.

September 22 that Salaman had a white iPhone; the arresting police officers had initially seized the iPhone but then allowed Salaman to give it away to an acquaintance at the scene.[9]

On the basis of the ATF's investigation of an alleged associate of Salaman, Agent Riordan also had strong reason to believe that there would be incriminating communications on Salaman's iPhone about drug robberies, shootings, and firearm possession.[10] He hoped to seize the iPhone during the execution of the arrest warrant if it was in plain view or if it was found on Salaman's person or if Salaman gave his consent to its seizure.[11]

The agents eventually executed the arrest warrant at about 10:00 am on the morning of October 2.[12] They did not engage in any pre-arrest surveillance of the house that morning, and they had no information to suggest that anyone other than Salaman, his mother, and his step-father were in the home.[13]

After an entry team of agents knocked-and-announced at the front door, Salaman's step-father let them into the home.[14] Inside there was a stairway going directly up from the front door, and there was a living room area immediately to the right.[15] The agents learned that Salaman was upstairs, and they called for him to come down.[16] He came down the stairs from his bedroom which was on the left side immediately at the top of the stairs.[17] The agents detained and

---

[9] *Id.* at 12-14, 80-81. It turned out that the iPhone was gold in a white case. *Id.* at 114.
[10] *Id.* at 14-15, 52-53, 75-76; *see also* Doc. #47 at 3 (discussing photographs of associate and Salaman with a firearm and text messages between associate and Salaman discussing drug robberies, shootings, and firearm possession).
[11] Doc. #91 at 48.
[12] *Id.* at 23, 85.
[13] *Id.* at 30, 49, 60, 62, 95-96. Nor did the agents see or hear anything while they were in the home to suggest that there were any unknown persons inside. *Id.* at 95-96.
[14] *Id.* at 85, 93.
[15] *Id.* at 85; *see also* Def. Exs. A-E (photographs of stairway, portion of adjoining living room, and second-floor bedroom to left at top of stairs).
[16] Doc. #91 at 124.
[17] *Id.* at 85-87, 94, 98.

handcuffed him at the bottom of the stairs.[18] They secured Salaman as well as his mother and step-father in the living room.[19]

 

Two of the officers—Officers Derek Huelsman and Frank Grillo—then went upstairs into Salaman's bedroom in order to conduct a protective sweep.[20] On the left side of the room, they saw Salaman's iPhone lying on his bed and plugged into a charger in the wall.[21] Officer Huelsman went back downstairs to advise Agent Riordan, and Agent Riordan told him to seize

---

[18] *Id.* at 86, 124.
[19] *Id.* at 94, 130.
[20] *Id.* at 107, 131. Officer Grillo's testimony initially created an impression that he went upstairs for a "secondary sweep" only after other officers had already gone upstairs to conduct an initial sweep. *Id.* at 129-32. But Officer Grillo had not been part of the initial entry team, and subsequent questioning made clear that he did not know whether any other officers had already gone upstairs to conduct a protective sweep before he and Officer Huelsman did so. *Id.* at 132-33. I credit Officer Huelsman's testimony that no other officers conducted a sweep upstairs before he, Officer Huelsman, and unnamed other officers did so. *Id.* at 86-87. Because Salaman does not challenge the protective sweep of any areas of the house other than his bedroom, I have no occasion to address whether these other areas were lawfully subject to a protective sweep.
[21] *Id.* at 107-11.

the iPhone.[22] Officer Huelsman returned and seized the iPhone.[23] Later that same day the ATF promptly sought and obtained a search warrant to search the iPhone.[24]

## DISCUSSION

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." A "search" occurs for purposes of the Fourth Amendment if the police seek information by intruding on a person's reasonable expectation of privacy or by means of trespassing upon one's person, house, papers, or effects. *See United States v. Smith*, 967 F.3d 198, 205 (2d Cir. 2020).[25] A "seizure" of personal property occurs if the police take possession of or meaningfully interfere with an individual's possessory interests in that property. *See ibid.*

A criminal defendant may move to suppress evidence on the ground that it has been searched or seized in violation of the defendant's Fourth Amendment rights. Although the defendant bears an initial burden to show that he has "standing" (*i.e.*, that the police engaged in conduct that amounted to a search or seizure of the defendant's person, house, papers, or effects), the burden then shifts to the Government to prove that any warrantless search or seizure was valid under the Fourth Amendment. *See United States v. Delva*, 858 F.3d 135, 148 (2d Cir. 2017); *United States v. Kiyuyung*, 171 F.3d 78, 83 (2d Cir. 1999).[26]

---

[22] *Id.* at 33, 89-90.
[23] *Id.* at 110-11, 135. Officer Grillo testified that he also obtained clothing for Salaman. *Id.* at 136. Because the Government has not argued (except belatedly by way of a supplemental reply brief) that the officers were entitled to enter Salaman's bedroom to retrieve his clothing and that the iPhone was lawfully seized in plain view as a part of the retrieval of clothing (which was obtained from a closet on the opposite side of the room from the bed where the iPhone was found), I conclude that the Government has waived or forfeited reliance on this alternative ground for seizure of the iPhone.
[24] Doc. #56-3. Apart from Salaman's challenge to the seizure of his iPhone, he does not challenge the validity of the search warrant for the iPhone.
[25] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.
[26] More recent decisions of the Second Circuit include statements that could be read to suggest that a criminal defendant bears the entire burden of proof when seeking to suppress evidence under the Fourth Amendment. *See United States v. McKenzie*, 13 F.4th 223, 233 (2d Cir. 2021) (stating that "[t]he burden to show a Fourth

Here, the Government does not dispute Salaman's threshold showing by affidavit that he resided at the home searched by the officers and that it was his iPhone that was seized by the officers.[27] Accordingly, the burden shifts to the Government to prove the validity of its warrantless seizure of the iPhone.

The "very core" of the Fourth Amendment "is the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *See Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (2021). But if the police have an arrest warrant, they may enter the home of the arrestee in order to execute the warrant, because "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980). Still, however, an arrest warrant is not the same as a search warrant; it allows the police to enter an arrestee's home only to execute an arrest and not to conduct a general search of the home. *See Mincey v. Arizona*, 437 U.S. 385, 391–92 (1978); *United States v. Robertson*, 239 F. Supp. 3d 426, 450 (D. Conn. 2017).

The Government does not dispute these principles. It argues instead that the arresting officers had lawful authority without a search warrant to enter Salaman's bedroom and then to seize Salaman's iPhone. It relies on a combination of two exceptions to the Fourth Amendment's warrant requirement: the "protective sweep" exception and the "plain view" exception.

---

Amendment violation rests with the defendant"); *United States v. Peeples*, 962 F.3d 677, 692-93 (2d Cir. 2020) (stating that a defendant "bears the burden of establishing that his rights under the Fourth Amendment were violated and that any unlawfully-obtained evidence should have been excluded from trial"). But these rulings do not cite or acknowledge the prior Second Circuit rulings in *Delva* and *Kiyuyung*, which make a key distinction between a defendant's initial burden to show the occurrence of a search or seizure that affected the defendant's protected interests and the Government's subsequent burden to show that such a warrantless search or seizure complied with the Fourth Amendment. In addition, the factual context of the decisions in *McKenzie* and *Peeples* concerned only whether the defendant had carried the initial burden to show that a search or seizure affecting his Fourth Amendment rights had occurred.
[27] Doc. #43-2 at 1-2.

*Protective sweep*

In *Maryland v. Buie*, 494 U.S. 325 (1990), the Supreme Court held that when the police enter a home to execute a warrant they may under certain circumstances engage in a protective sweep of certain areas of the home to guard against the possibility of attack from an unknown person inside. *Id.* at 327. The Supreme Court stated a two-part standard that governs what parts of the home may be subject to a protective sweep. First, "as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334. Second, if the police wish to sweep any areas "beyond" those "spaces immediately adjoining the place of arrest from which an attack could be immediately launched," then they may do so only if they have "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Ibid.*

Thus, as the Second Circuit has more recently stated: "The permissible scope of a protective sweep depends on the conditions of the arrest: officers may 'look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched' without probable cause or reasonable suspicion; broader searches, however, must be justified by 'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" *United States v. Kirk Tang Yuk*, 885 F.3d 57, 78 (2d Cir. 2018) (quoting *Buie*, 494 U.S. at 334).

Special Agent Riordan supervised the execution of the arrest warrant in this case, and he testified about his experience involving the execution of as many as 150 arrest warrants in the

7

past five years.[28] He told me that "[w]e go on the assumption that there are hostiles in the house every single occasion," such that the ATF always "clear[s] the whole house" as a "categorical matter" when conducting a search or arrest warrant.[29] If so, then it is clear that the ATF has a policy that violates the constitutional limitations imposed by the Supreme Court in *Buie* on the scope of protective sweeps. These limitations do not allow law enforcement agents to categorically assume that there are dangerous persons concealed inside a house and to categorically assume that they may sweep the entire house in search of such persons.

I am also concerned about the testimony of Officer Grillo that there is a "common practice" to engage in a "secondary sweep" of a home as a form of "busy work" after agents have already completed an "initial sweep of the house," just "to make sure that nothing was missed."[30] If so, this practice conflicts with *Buie*'s command that a protective sweep must last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." 494 U.S. at 335-36; *see also Robertson*, 239 F. Supp. 3d at 450-52, 458-59 (suppressing evidence where ATF unlawfully prolonged protective sweep of defendant's residence for improper purpose of searching for narcotics evidence).

Rather than arguing that the ATF agents are categorically free to sweep (and re-sweep) entire houses when conducting arrest warrants, counsel for the Government primarily argues—under the second part of the *Buie* standard—that the agents had articulable facts to believe there was a third-party threat in the house.[31] But the record conclusively refutes this argument. I confirmed this when I questioned Agent Riordan at the suppression hearing:

---

[28] Doc. #91 at 19.
[29] Doc. #91 at 62-63.
[30] *Id.* at 130-31, 142.
[31] Doc. #89 at 4-5.

> THE COURT: So I take it, then, that the evidence that you had and that your law enforcement officers had of anybody being -- other than family members, the mom and the stepfather being in the house on the day of the arrest warrant at around 10:00 a.m. was zero, right?
>
> THE WITNESS: I had no idea who was in the house.[32]

I also asked Officer Grillo "did you know or have a belief or have any grounds to think that somebody was hiding out in the bedroom?" He answered "No."[33]

Instead of pointing to any articulable facts for the agents to believe that there were any unknown and dangerous third parties in the home, the Government tries to change the subject by arguing that Salaman himself was dangerous, that he had dangerous friends, and that he likely had guns in the house.[34] But, as the Second Circuit has ruled, each one of these factors is not enough to justify a sweep beyond the areas that immediately adjoin the place of arrest unless there are *additional* facts to suggest the presence of a third person who might launch an attack. *See United States v. Gandia*, 424 F.3d 255, 264 (2d Cir. 2005) (rejecting same arguments).[35]

In short, the Government has failed to show under the second step of the *Buie* standard that the agents had articulable facts to conclude that there were any potentially dangerous third parties in the house. All that said, however, this still leaves open the initial inquiry under the alternative first step of the *Buie* standard: whether Salaman's bedroom was an area that was "immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie*, 494 U.S. at 334.

---

[32] Doc. #91 at 60.
[33] *Id.* at 144.
[34] Doc. #68 at 16.
[35] The Government argues that "*Buie* is directly on point with no facts distinguishing it from Salaman's arrest and the seizure of his phone" and that "the Supreme Court blessed the protective sweep and refused to suppress evidence found in plain sight during that sweep." Doc. #89 at 2 n.2. This argument mischaracterizes the Supreme Court's decision in *Buie* which by no means "blessed" the particular sweep that took place in that case but instead remanded for further proceedings consistent with the correct legal standard as stated by the Supreme Court.

For these purposes, the Second Circuit has ruled that a room counts as "immediately adjoining" if it opens into "a single, undivided space" that includes the place of arrest. *See Kirk Tang Yuk*, 885 F.3d at 78–79. Thus, in *Kirk Tang Yuk*, the Second Circuit affirmed a protective sweep of a master bedroom which was located on the far side and across a living room that was adjoined as part of a single, undivided space with a front hallway where the defendant was arrested. *Ibid.* The Second Circuit ruled that it was "entirely fair to say that the master bedroom immediately adjoined the room in which [the defendant] was arrested." *Ibid.*

The *Kirk Tang Yuk* decision—with its definition of what constitutes an "immediately adjoining" area—controls here. As is clear from the photograph exhibits, Salaman's bedroom was located immediately at the top of the stairs, and the stairway area formed a single, undivided space between his bedroom and his place of arrest at the bottom of the stairs. Under *Kirk Tang Yuk*, his bedroom was an "immediately adjoining" area where the agents were permitted to conduct a protective sweep despite lacking articulable facts to believe that a third party was concealed there.[36]

To similar effect, the D.C. Circuit has interpreted *Buie* to allow the police to search a bedroom that opened into a hallway after the police arrested the defendant in the hallway. *See United States v. Thomas*, 429 F.3d 282 (D.C. Cir. 2005). "Because the entrance to the bedroom was a straight shot down the hallway from the spot where [the defendant] was arrested, the bedroom was a place 'immediately adjoining the place of arrest from which an attack could be immediately launched.'" *Id.* at 287 (quoting *Buie*, 494 U.S. at 334). Despite the fact that the

---

[36] In light of the Second Circuit's ruling in *Kirk Tang Yuk*, I am not persuaded by the older district court decisions relied on by Salaman to the extent that their dicta or their facts might suggest a different result. *See Vece v. DeMaio*, 2010 WL 3490963, at *3 (D. Conn. 2010); *United States v. Zubiate*, 2009 WL 483199, at *4 (E.D.N.Y. 2009); *United States v. Ali*, 2006 WL 929368, at *4 (E.D.N.Y. 2006); *United States v. Rudaj*, 390 F. Supp. 2d 395, 400 (S.D.N.Y. 2005), *aff'd on different grounds sub nom. United States v. Ivezaj*, 568 F.3d 88 (2d Cir. 2009).

...

...

defendant in *Thomas* was moved to a different location in the living room of the house after he was arrested, the D.C. Circuit noted that the officers "had to depart through the hallway, and they need not have done so without first taking the precautionary measure of a limited protective sweep to avert a potential attack from one of the rooms adjoining the hallway." *Id.* at 288.

The same concerns hold true here. Salaman was arrested at the bottom of the stairway. As the photographs make clear, it was a straight shot from the entrance of his bedroom down the stairway to where he was arrested as well as to the entrance of the house which the agents would have to use to depart the premises. A hypothetical accomplice in the bedroom could launch an immediate attack down the stairs just by sticking a gun out from the bedroom. He would even have the high ground. Accordingly, despite the absence of any articulable facts to suggest that there was a dangerous third party concealed in Salaman's bedroom, his bedroom was an area that was immediately adjoining the place of arrest and where the agents had lawful authority under *Buie* to conduct a protective sweep.

### *Plain view*

The plain view exception to the Fourth Amendment's warrant requirement allows the police to seize evidence under certain circumstances. The exception applies if the following three requirements are met: (1) the police have a lawful right of access to the evidence, (2) the evidence is in plain view, and (3) the criminality of the evidence is immediately apparent. *See Horton v. California,* 496 U.S. 128, 136 (1990); *United States v. Galpin*, 720 F.3d 436, 451 (2d Cir. 2013).

The Government has carried its burden to show each of these three elements as to the seizure of Salaman's iPhone. First, the police had a lawful right of access to the iPhone because—as discussed above—they were lawfully within Salaman's bedroom to conduct a

protective sweep. Second, the iPhone was in plain view. I credit the testimony of Officers Huelsman and Grillo that they clearly saw the iPhone on the bed as it was charging, and I decline to credit the contrary affidavit of Salaman that the iPhone was under the covers. Third, the criminality of the iPhone was immediately apparent in light of what Officers Huelsman and Grillo knew about the iPhone as an object of interest and the particularized knowledge of Agent Riordan who authorized its seizure. *See Kirk Tang Yuk*, 885 F.3d at 79-80 (applying plain view exception to allow law enforcement agents to seize two cell phones during the course of protective sweep of a bedroom and where "the officers had probable cause to seize the cell phones as likely connected with [defendant's] criminal activity").

## CONCLUSION

The motion to suppress (Doc. #43) is DENIED. Although the Court concludes that the agents lawfully conducted a protective sweep of Salaman's bedroom and lawfully seized his iPhone in plain view, this ruling should not be understood to conclude that the agents lawfully conducted protective sweeps of other rooms of the home that were not immediately adjoining Salaman's place of arrest.

It is so ordered.

Dated at New Haven this 15th day of November 2021.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge